IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION
RECEIVED

In the matter of:                                )
                                                 )
United States of America,          OCT - 3 2018   Misc. No. 2:18-mc-3837-WKW
                                                 )
        Petitioner,                    CLERK     )
                                 U.S. DISTRICT COURT
                                 MIDDLE DIST. OF ALA.
v.                                               )
                                                 )
Jefferson S. Dunn, in his official capacity as   )
Commissioner of the Alabama Department           )
of Corrections,                                  )
                                                 )
        Respondent.                              )
_____          )

## PETITION TO ENFORCE U.S. DEPARTMENT OF JUSTICE SUBPOENA

The United States of America, through the Acting Assistant Attorney General for Civil

Rights and the U.S. Attorney for this District, hereby petitions this Court for an order to show

cause why Respondent, Commissioner Jefferson S. Dunn of the Alabama Department of

Corrections (ADOC), should not be ordered to comply with the U.S. Department of Justice's

(Department) administrative subpoena, CRIPA Subpoena No. 2017-01.

In October 2016, the Department opened an investigation into ADOC facilities housing

male prisoners, pursuant to § 3A(b)(2) of the Civil Rights of Institutionalized Persons Act

(CRIPA), 42 U.S.C. § 1997a-1. Shortly thereafter, the Department issued its first document

requests. After ADOC failed or refused to produce the vast majority of the requested documents,

the Department issued and served a subpoena in May 2017 demanding many of those same

documents.

After the subpoena was issued, ADOC still delayed producing or refused to produce many of the documents demanded in the subpoena. To facilitate the production of those documents, the Department took several actions. These included, among other things, the Department: (1) sending its own personnel and equipment to numerous correctional facilities and ADOC headquarters to scan relevant documents, rather than ADOC providing copies; (2) seeking autopsies and medical information directly from state or county agencies, rather than directly from ADOC; and (3) requesting individual investigative files, inmate records, and medical records by individual inmate names, rather than ADOC producing them by subject matter or date range, as demanded in the subpoena.

In taking these actions, the Department attempted, in good faith, to obtain the documents necessary to further the investigation. Despite these attempts, ADOC has continued to delay, impede, or refuse to respond to certain portions of the Department's subpoena. The United States therefore requests that this Court order that ADOC show cause as to why it should not produce within 30 days the following documents pursuant to CRIPA Subpoena No. 2017-01: (1) the individual prisoner investigative files specifically identified by the Department, or, in the alternative, the underlying factual documents supporting the investigation; and (2) the attachments to ADOC's second production of incident reports.[1]

Prior to filing this Petition, the Department conferred with counsel for ADOC and attempted to establish a reasonable timeline for producing the documents at issue. That

---

[1] Prior to the meet and confer, ADOC informed the Department that it would not produce any attachments—such as witness statements and body charts—to the second production of incident reports, despite producing attachments in its earlier and initial production of the incident report database. During the meet and confer, ADOC reversed course and agreed to produce the attachments to the second production of incident reports. Nevertheless, ADOC has informed the Department that it will convert certain attachments from their native format and will need to affix a confidential stamp to each attachment before they can be produced. ADOC estimates that this process will take an additional two months (these documents were first requested three months earlier). The Department offered to stamp each document as confidential as they are loaded into the Department's database. ADOC rejected that offer.

conference did not produce a full resolution of the dispute.  However, ADOC did agree to produce, within a month, the following subpoenaed documents:  (1) autopsy reports drafted by the University of Alabama–Birmingham;[2] (2) the investigative memorandums for certain closed investigations; (3) a list of the open investigations requested; (4) the Intelligence and Investigations (I&I) Division's weekly report drafted by Director Mercado for September 2016 through September 2017; and (5) copies of certain individual medical records that were not made available for the Department to scan on-site at certain correctional facilities.[3]

**In support of this Petition, the United States alleges as follows:**

1.      This is a proceeding brought pursuant to § 3A(b)(2) of the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997a-1, to judicially enforce a CRIPA subpoena.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343, 1345, and 42 U.S.C. § 1997a-1(b)(2).

3.      Venue is proper in this District pursuant to 42 U.S.C. § 1997a-1(b)(2) because ADOC is headquartered in Montgomery, Alabama, and a substantial part of the events and policy decisions that gave rise to this statewide investigation and subpoena occurred in this District.

---

[2] On October 3, 2018, ADOC notified the Department that it shipped to the Department a USB flash drive containing the University of Alabama–Birmingham autopsy reports. ADOC has also promised to produce any autopsy reports in its possession not previously obtained by the Department from other sources.

[3] If ADOC does not produce those documents as agreed, the Department reserves the right to amend the relief sought in this proceeding and seek an order that ADOC show cause as to why it should not produce those documents pursuant to CRIPA Subpoena No. 2017-01.

4.    CRIPA, 42 U.S.C. § 1997a, authorizes the Attorney General to investigate

conditions of confinement in correctional facilities and initiate civil actions in the name of the

United States against state or local officials where the Attorney General has

> reasonable cause to believe that any State or political subdivision of a state,
> official, employee, or agent thereof, or other person acting on behalf of a State or
> political subdivision of a State is subjecting persons residing in or confined to an
> institution . . . to egregious or flagrant conditions which deprive such persons of
> any rights, privileges, or immunities secured or protected by the Constitution. . .
> pursuant to a pattern or practice of resistance to the full enjoyment of such rights,
> privileges, or immunities.

42 U.S.C. § 1997a(a).

5.    Section 3A of CRIPA provides:

> The Attorney General, or at the direction of the Attorney General, any officer or
> employee of the Department of Justice may require by subpoena access . . . to any
> document, record, material, file, report, memorandum, policy, procedure,
> investigation, video or audio recording, or quality assurance report relating to any
> institution that is the subject of an investigation . . . .

42 U.S.C. § 1997a-1(a); *see United States v. Hale*, No. 2:16-mc-01792-MHH, slip op. (N.D. Ala.

June 30, 2017) (holding that the Department has authority to conduct interviews during site visits

conducted pursuant to CRIPA) (Attached as Exhibit 1).

6.    The Attorney General has delegated authority to issue, serve, and seek

enforcement of subpoenas pursuant to CRIPA to the Assistant Attorney General for the Civil

Rights Division and any Deputy Assistant Attorney General for the Civil Rights Division. (*See*

Exhibit 2.)

7.    The Department is conducting its CRIPA investigation of ADOC's correctional

facilities housing male prisoners for a legitimate purpose: to determine whether there are

conditions that deprive prisoners of any rights, privileges, or immunities secured or protected by

the Constitution.

4

8.      Specifically, the Department's investigation into facilities housing male prisoners seeks to determine whether there is a pattern or practice of failing to protect prisoners from: (1) physical harm and sexual abuse at the hands of other prisoners; (2) the use of excessive force and sexual abuse by correctional officers or staff; and (3) the lack of sanitary, secure, and safe living conditions.

9.      Jefferson S. Dunn, as ADOC Commissioner, is responsible for the operation of all ADOC correctional facilities.

10.     As required by CRIPA, on October 6, 2016, the Department provided seven days' written notice of its investigation to Commissioner Dunn; the Governor of Alabama, who was then Robert Bentley; the Attorney General of Alabama, then Luther Strange; and to the wardens of the fourteen correctional facilities under investigation. *See* 42 U.S.C. § 1997b(a)(2). Representatives from the Department also called and spoke to counsel for Governor Bentley and to the Alabama Attorney General to directly notify them of the Department's intent to conduct this investigation prior to issuing the requisite notice letter. (*See* Exhibit 3.)

11.     After notifying the State of Alabama of this investigation, the Department issued its first request for documents on December 6, 2016, and asked that all documents be produced by January 13, 2017. (*See* Exhibit 4.)

12.     During the subsequent five months, ADOC failed to timely and adequately respond to the vast majority of the Department's requests for documents.

13.     In an attempt to facilitate production of documents and ease any burden on ADOC, the Department provided numerous concessions and offers of assistance to ADOC. Among these proposals were offers to: narrow the document requests; allow ADOC to produce documents on a rolling basis; allow access to the Department's Information Technology (IT)

5

personnel to assist with production of electronic materials; send Department personnel to find and scan the documents needed; rent equipment at Department expense to scan documents; and enter into a clawback agreement in the event privileged material was inadvertently produced. Despite these offers, ADOC failed to timely and adequately provide most of the requested documents.

14.     In light of ADOC's failure to timely and adequately respond to most of the Department's requests and correspondence, on May 8, 2017, Robert Moossy, Deputy Assistant Attorney General for the Civil Rights Division, signed and issued CRIPA Subpoena No. 2017-01 upon Commissioner Dunn's representative. (*See* Exhibit 5.)

15.     On May 9, 2017, the Executive Assistant to ADOC's General Counsel and authorized agent of Commissioner Dunn, was properly served with CRIPA Subpoena No. 2017-01 at 301 South Ripley Street, Montgomery, Alabama, 36130. (*See* Exhibit 6.)

16.     The date set for ADOC to respond to CRIPA Subpoena No. 2017-01 was June 8, 2017, or 30 days from the receipt of service. (*See* Exhibit 5.)

17.     On May 9, 2017, the Acting Assistant Attorney General of the Civil Rights Division called the Attorney General of the State of Alabama, Steve Marshall, to notify him of the subpoena. In response, the Alabama Attorney General arranged a meeting between the Department and ADOC to discuss the subpoena. This meeting between representatives from ADOC, the Office of the Alabama Attorney General, and the Department took place on May 24, 2017, at the Office of the Alabama Attorney General.

18.     Following that meeting, ADOC agreed to produce within a month the following documents:

6

    a. the incident report database, in native format, responsive to Subpoena Request 2;

    b. lists of prisoners who were sent to hospitals or who died, which would be partially responsive to Subpoena Requests 3 and 6;

    c. a spreadsheet compiling disciplinary matters of employees, partially responsive to Subpoena Request 5; and

    d. any internal reports tracking prisoners' public health, responsive to Subpoena Request 13.

(*See* Exhibit 7.)

19. In June 2017, ADOC provided the incident report database, a list of prisoners who died while in custody, and spreadsheets detailing employee disciplinary actions. But, for the list of prisoners who were sent to hospitals and any internal reports tracking prisoner health, ADOC asked the Department to work to obtain them from ADOC's medical contractor.

20. For the remaining subpoenaed documents, ADOC agreed to: (1) make them available to the Department for inspection and copying at the location where the documents are housed, most of which are located at individual correctional facilities; (2) asked the Department to identify individual files by name when making further requests;[4] or (3) asked the Department to work to obtain certain documents from ADOC's medical contractor or other state agency.[5] (*See* Exhibit 7.)

---

[4] At the May 24, 2017 meeting, the Department and ADOC briefly discussed access to facilities as detailed in the subpoena. The subpoena required access to a correctional institution in the Southern District of Alabama in August 2017, one in the Northern District of Alabama in September 2017, and one in the Middle District of Alabama in October 2017. Due to negotiations over the logistics of the prison visits, the first of the visits did not take place until September 2017. (*See* Exhibit 7.)

[5] All of these documents were ultimately in the custody or control of ADOC. They were either: (1) maintained by ADOC and provided to the contractor or state agency by ADOC; or (2) were documents provided by the contractor or state agency to ADOC.

21.     Between September 13, 2017, and February 1, 2018, the Department inspected three facilities with restricted access and interviewed members of management at ADOC's Central Office. In conjunction with these visits, and as the Department continued to review the incident report database and obtained information from prisoners and ADOC staff, the Department repeatedly requested documents responsive to the subpoena. Some of these subpoenaed documents, such as the duty post logs and rosters for the three facilities inspected by the Department, were made available for the Department to scan during the visits to the facilities.

22.     For many of the other documents, ADOC stated that it could not be responsible for producing them because the documents were technically in the possession of ADOC's own third-party contractor or another state entity. For example, ADOC would not produce autopsy reports in its possession, stating those had to be obtained from the state agency that conducted the autopsy.[6] Similarly, ADOC would not provide public health data in its possession, instead telling the Department it would need to obtain that information from the state public health agency.

23.     This method of document production was inefficient and time consuming, leading to extraordinary delays. For example, despite earlier representations that it would provide a list of prisoners who were transported to outside medical facilities for emergency purposes, ADOC reversed course. (*See* Exhibit 7.) Specifically, ADOC indicated that it would not provide to the

---

[6] ADOC informed the Department that it should request prisoner autopsies from the Alabama Department of Forensic Sciences (ADFS). The Department contacted ADFS and obtained some autopsies, but was informed that ADFS did not perform many of the autopsies of prisoners who died in ADOC's custody. In September 2018, ADOC informed the Department that it believed it did have autopsies performed by the University of Alabama–Birmingham and perhaps a few others by various other county agencies and asked the Department to provide ADOC a list of the ones it still needed. The Department does not have a complete list of missing autopsies because ADFS is providing them on a rolling basis. Regardless, ADOC is best able to answer the question of who has died in ADOC custody and provide the corresponding autopsies in its possession.

8

Department the requested medical data in its possession related to prisoner visits to outside hospitals, sexual assaults, or deaths. Instead, ADOC informed the Department that it should request that information directly from ADOC's contractor for medical services.[7]

24.     Other subpoena requests were either ignored or refused. For example, in August 2017, the Department sent four representatives with scanning equipment to ADOC's Central Office. Despite working throughout the day, the Department was unable to scan all of the files. In February 2018, when the Department requested access to the nine remaining files, ADOC refused, stating that it would no longer produce *any* documents in the investigation until the Department entered into a Non-Disclosure Agreement (NDA) with ADOC. Despite having produced documents to the Department for over a year without requiring an NDA, this was the first time ADOC had demanded such an agreement before producing documents. (*See* Exhibit 9.)

25.     The Department agreed to negotiate and enter into an NDA related to the investigation. After the NDA was signed, the Department again requested access to the remaining files and other documents that it had requested, but not received from ADOC during the December 2017 visit to ADOC's Central Office and during a January 2018 visit to Holman Correctional Facility. ADOC provided some of the material requested, but eventually refused to produce any files of ongoing investigations, as well as the weekly reports provided by the I&I Division to the Commissioner that summarized the cases on which I&I was currently working.[8]

---

[7] On November 7, 2017, the Department sent a letter requesting these documents from ADOC's medical contractor, copying ADOC. After not receiving a response about these documents, the Department followed up by email on December 21, 2017, and again by phone on January 4, 2018. These documents were eventually produced by ADOC's medical provider in March of 2018. (*See* Exhibit 8.)

[8] The Department had requested only a year's worth of these weekly summaries—for September 2016 through September 2017—in an attempt to limit the request and not overburden ADOC.

ADOC refused to produce those documents because they "encompass[] matters that are the subject of ongoing, open criminal investigations [and] [i]t is ADOC's policy and practice not to release investigative materials publicly . . . ." (*See* Exhibit 10.)  Similar to the NDA, this was the first time ADOC had used this rationale to refuse to produce documents, although they had already produced investigative files related to ongoing investigations months earlier.[9]

26.     The Department responded by letter on March 23, 2018, and reminded ADOC that it was still required by the subpoena to produce these documents despite the fact that some of the information may relate to matters currently under investigation.  The Department informed ADOC that CRIPA specifically permitted access to such information. *See* 42 U.S.C. § 1997a-1 (The Department may require by subpoena access "to any document, record, material, file, report, memorandum, policy, procedure, investigation . . . relating to any institution that is the subject" of a CRIPA investigation.).  Further, regardless of ADOC's belief that such information is not discoverable under CRIPA, the Department suggested that ADOC could redact portions of the reports and certain files, rather than refuse to provide any of the material.  (*See* Exhibit 11.)

27.     On April 20, 2018, ADOC responded by letter and asked that, rather than produce the I&I database containing investigative files—which it claimed was impossible for their IT professionals to do—that the Department provide a list of individuals who were under investigation by I&I for which the Department sought documentation.  The Department complied with ADOC's request and provided such a list containing hundreds of names.  ADOC then advised that it would take "countless months and possibly years" to work their way through

---

[9] Shortly after the subpoena was issued, ADOC produced eleven investigative memorandum, both open and closed, in response to a request for investigative files of staff disciplined for use of excessive force.

the investigative report database to identify those names.[10]  ADOC did agree to provide the 52

weekly I&I summaries, but stated it would do so on a rolling basis.  In the next five months,

ADOC produced only eight of these redacted weekly reports.[11]  (*See* Exhibit 12.)

28.    Believing it would be more productive to discuss these issues by phone, the

Department called ADOC and, after several attempts, was able to reach ADOC counsel on April

30, 2018.  On the call, the Department agreed that it would continue to review the approximately

65,000 incident reports and would provide ADOC with a list of names for which additional

records were needed.  ADOC agreed to provide the I&I weekly reports, redacted, on a rolling

basis.  ADOC also agreed to provide more incident reports, given that the last production only

went through June 2017.  The Department believed this call to be productive, but was concerned

about the pace of document production because of ADOC's numerous delays and obstacles

related to document production.  (*See* Exhibit 13.)

29.    On June 29, 2018, the Department called ADOC to follow-up on a previous

request to update the list of prisoner deaths, which only included data through December 2017.

After ADOC did not respond, the Department emailed ADOC on July 11, 2018.  ADOC

responded the following day, and one of its attorneys informed the Department that the

individual was working on our request but would be on extended leave for approximately eight

weeks.  The response stated, "I appreciate you limiting additional requests during this time, as

[others on our staff] are both tied up with their numerous other duties."  Although the

---

[10] At multiple points during the investigation, including at the outset, the Department requested that its IT personnel meet with their ADOC counterparts to provide assistance and reduce any burden on the agency.  Aside from allowing its IT personnel to attend the meeting at the Alabama Attorney General's Office, ADOC refused to permit such a meeting.

[11] On October 1, 2018, during the meet and confer in preparation for filing this action, ADOC stated they would produce the remaining 44 weekly reports within a month.

Department had been informed on June 13, 2018 that ADOC counsel would be on leave in mid-July, this was the first time ADOC had informed the Department that the leave was for eight weeks and that ADOC wanted the Department to limit document requests during that time. (*See* Exhibit 14.)

30.     For months, the Department had been working to review the incident reports and thousands of other documents and was preparing a list of individual names to provide to ADOC. The Department still needed many documents demanded in the subpoena, including investigative files, medical records, inmate files, and data on deaths.

31.     In an effort to provide ADOC with additional requests before the attorney left for eight weeks, the Department emailed ADOC the very next day, on July 13, 2018. In that email, the Department requested several items, including: (1) investigative files and medical records for a list of individually identified prisoner names; and (2) an updated list of 2018 prisoner deaths that it still had not received. A few days later, on July 18, 2018, the Department provided an additional list of prisoner names identifying additional investigative files. (*See* Exhibits 15.)

32.     On Tuesday, July 17, 2018, ADOC's Interim General Counsel responded by email, stating that the Department "could not have picked a worse time to give them additional document requests" because another matter that ADOC is handling "is in full swing" and, "with the exceptions of the I&I weekly reports and the updated death list, [the Department is] simply going to have to wait until I can get past the pots that are boiling over on my stove right now or until [the other attorney] comes back – whichever comes first." (*See* Exhibit 16.)

33.     The next day, the Department responded by email, and noted that the investigation had been open for almost two years. The Department sought ADOC's cooperation in document production, particularly since both sides had expressed interest in completing this

investigation. The Department once again offered to work with ADOC to expedite these requests, including coming to ADOC's Central Office, scanning the documents for ADOC, and sending Department IT professionals to work with ADOC to assist and expedite production. The Department also made clear that it would be happy to discuss this matter by phone to achieve a solution. (*See* Exhibit 17.)

34.     Moreover, the Department reminded ADOC that these requests were not merely "additional" requests, but were instead directly responsive to the subpoena issued by the Department in May 2017, over a year earlier. Instead of producing the investigative files and medical records related to deaths, rape, and violence, ADOC produced their incident report database for 2015 through June 2017 and asked that the Department examine it and provide it with specifically identified requests. Yet when the Department did so, ADOC protested and still refused to respond. (*See* Exhibit 18.)

35.     On August 1, 2018, the Department contacted ADOC to notify them that their second production of updated incident reports, which ADOC had produced in March 2018, failed to include the attachments to the incident reports.[12] In response to the subpoena—which required production of the "incident report database," and not just the incident reports—ADOC had previously produced all incident reports *and attachments* to the Department. Now, inexplicably, ADOC was refusing to produce the attachments.[13]  (*See* Exhibit 19.)

36.     In September 2018, ADOC allowed the Department to send contractors with their own scanners to individual correctional facilities to scan the requested prisoner medical records.

---

[12] Incident reports oftentimes have multipole attachments, including witness statements, photographs, body charts documenting injuries, and so on.

[13] *See supra* n.1.

13

However, for some of the prisoners, the files were not made available—either because the prisoner was transferred between the time the scanning date was set and the time the scanners arrived or because the requested prisoner had been killed or died in ADOC custody and the medical records had thus been transferred offsite. Prior to the meet and confer leading up this Petition, ADOC was unwilling to provide copies of these missing medical records.

37.    For an extended period, ADOC has stalled in responding to the Department's numerous requests for documents. ADOC has refused to respond to document requests or made excuses as to why it could not respond.

38.    The Department has sought to foster a cooperative relationship with ADOC, and has conceded to its delays and catered to its conditions for document production. The Department has made numerous concessions to obtain documents and ease any burden of production, including (1) scanning and copying ADOC's documents; (2) providing ADOC with hardware for the production of its digital files; (3) offering the assistance of Department IT professionals; (4) paying for contractors and scanners to be brought to numerous correctional facilities and ADOC's Central Office to scan documents; (5) signing an NDA; and (6) agreeing to ask for the majority of the documents demanded in the subpoena by identifying the individual file by name.

39.    Despite these concessions and patience exhibited by the Department, and prior to the Department informing ADOC it was filing this action, ADOC was unwilling to produce: (1) most of the individual prisoner investigative files requested; (2) the attachments to the second production of incident reports; (3) all prisoner autopsies for the year 2016 through the present; (4) copies of medical records not made available by ADOC for the Department to scan; and (5) in a timely manner, the I&I weekly report drafted by Director Mercado.

14

40.     On September 27, 2019, the Department contacted ADOC by phone to inform it

of the Department's intention to file this Petition.  During that call and other subsequent

communications, ADOC agreed to produce, within a month:  (1) the requested investigative

memorandums for closed investigations;[14] (2) a list of investigations that were currently open for

the files requested; (3) autopsies performed by the University of Alabama–Birmingham;[15] and

(4) copies of the twelve medical records not made available for scanning at the individual

correctional facilities.[16]  (*See* Exhibit 20).

41.     Nonetheless, ADOC has refused to produce open, or incomplete, investigations.

When the Department suggested an alternative, ADOC also refused to produce any underlying

factual documents supporting the investigation.  ADOC did state that they were able to produce

the attachments to the second production of incident reports but it would take at least an

additional two months to do so.  The request for these attachments was made three months

earlier.  Adding an additional two months or more is untimely and unreasonable.  (*See* Exhibit

20).

42.     The documents the Department has requested are essential to the investigation.

For example, the subpoena required the production of:

       a.  All documents created by the ADOC's Research and Planning Division,
           including any reports or statistical compilations, provided to the

---

[14] ADOC informed the Department it would be a lengthy process to produce the entire investigative file with the underlying factual documents and asked the Department to review all of the investigative memorandums for ADOC and then inform ADOC when it wanted the full file.

[15] ADOC stated that they may have additional autopsies but were not sure. ADOC asked the Department to provide a list of autopsies needed and ADOC would try to figure out if they had an autopsy or knew who performed it. On October 3, 2018, ADOC informed the Department that it shipped a USB flash drive to the Department containing the University of Alabama-Birmingham autopsy reports.

[16] Given ADOC's pattern of delay and obstruction over the two years of the investigation, as set forth in this petition, the Department worries ADOC will not produce these documents within a month, as promised.

Commissioner. When responding to this request, please do not produce any Monthly Statistical Reports or Annual Reports which are publicly available.

b. For all prisoners who were transported to an outside medical facility for emergency or acute care, please produce medical records, body charts, and investigatory documents related to the treatment provided and the incident which required outside medical treatment.[17]

c. Any documents related to prisoner claims or complaints of, and the investigation of, incidents or threats of: excessive force, sexual abuse, and extortion by ADOC's employees, agents, or contractors.[18]

d. Any documents related to reports of misconduct, records of discipline, and/or investigations of correctional officers, employees, and/or contractors related to sexual abuse, excessive force, extortion, bribery, contraband, and/or abandonment of post.[19]

e. A list of all prisoner deaths, and all documents related to the cause of death, including autopsy reports, medical records, and investigations.[20]

43.    The attachments to the incident reports are essential to determine whether prisoners have experienced violence, death, or sexual abuse and to further identify necessary follow-up documents.

44.    Individual prisoner medical records are essential to corroborate allegations of physical violence or sexual abuse at the hands of other prisoners and staff.

45.    ADOC's investigative files are essential to determine whether violence and sexual abuse are being properly addressed. CRIPA specifically permits access by the Department, a law

---

[17] This request, which asks for medical records, body charts, and investigatory documents related to prisoners transported to outside hospitals, encompasses the investigative files and documents, the I&I weekly reports, and the attachments to the incident reports all subpoenaed by the Department.

[18] This request includes the requested investigative files and the summaries of those files provided by I&I Director Mercado to Commissioner Dunn.

[19] This request also includes the requested investigative files and the summaries of those files provided by I&I Director Mercado to Commissioner Dunn.

[20] This request includes the investigations into deaths and the autopsies that were not performed by the ADFS.

enforcement agency, to all investigative files regardless of whether the incidents are still under investigation. *See* 42 U.S.C. § 1997a-1 (The Department may require by subpoena access "to any document, record, material, file, report, memorandum, policy, procedure, *investigation* . . . relating to any institution that is the subject" of a CRIPA investigation) (emphasis added).

46.     As of now, the Department has recent incident reports, which contain limited information, without the accompanying attachments—for example, witness statements, body charts, and medical records.

47.     Based on ADOC's representations, it is reasonably expected that ADOC will continue to delay and/or refuse to produce certain documents unless this Court orders it to comply with the subpoena and sets a schedule for production.

48.     The documents requested from ADOC are encompassed in CRIPA Subpoena No. 2017-01 and are relevant to the CRIPA investigation of ADOC's correctional facilities housing male prisoners and are reasonably tailored and defined and pose no undue burden on ADOC to produce and/or make available for inspection and copying.

49.     All necessary administrative steps required by CRIPA for the issuance of CRIPA Subpoena No. 2017-01 have been taken. (*See* Exhibit 24.)

### PRAYER FOR RELIEF

WHEREFORE, the Petitioner, United States respectfully prays that the Court:

1.     Issue an Order to Show Cause, directing Commissioner Dunn to show why he should not comply with and obey the aforementioned CRIPA Subpoena No. 2017-01 and provide the specific documents identified in the Department's subpoena. A proposed Order to Show Cause has been submitted with this Petition;

2.      Enter an Order directing Commissioner Dunn to, within 30 days, obey the aforementioned CRIPA Subpoena No. 2017-01 by producing (1) the requested individual prisoner investigative files, or, in the alternative, all underlying factual documents supporting the investigations; and (2) the attachments to the second production of incident reports;

3.      In the event that ADOC does not timely produce the following documents by November 2, 2018, issue an order directing Commissioner Dunn to, within 30 days, obey the aforementioned CRIPA Subpoena No. 2017-01 by producing:  (1) all autopsy reports within its possession from 2016 until the present; (2) a list of the requested open investigative reports; (3) the I&I weekly report drafted by Director Mercado for September 2016 through September 2017; and/or (4) the requested individual prisoner medical records not made available for scanning; and

4.      Grant any such other relief as is just and proper.

DATED this 3rd day of October 2018.

Respectfully submitted,

JOHN M. GORE
Acting Assistant Attorney General
Civil Rights Division

LOUIS V. FRANKLIN
United States Attorney
Middle District of Alabama

RICHARD W. MOORE
United States Attorney
Southern District of Alabama

JAY E. TOWN
United States Attorney
Northern District of Alabama

STEVEN H. ROSENBAUM
Chief
Special Litigation Section

JUDITH PRESTON
Principal Deputy Chief
Special Litigation Section

JASON R. CHEEK
Deputy Civil Chief
Northern District of Alabama

*Jerusha T. Adams*

JERUSHA T. ADAMS
Assistant United States Attorney
United States Attorney's Office
Middle District of Alabama
131 Clayton Street
Montgomery, Alabama 36104
(334) 551-1770
(334) 223-7418
jerusha.adams@usdoj.gov

CARLA C. WARD
Assistant United States Attorney
United States Attorney's Office
Northern District of Alabama
1801 Fourth Avenue North
Birmingham, Alabama 35203
(205) 244-2185
(205) 244-2181 (fax)
carla.ward@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing will be provided to the Respondent's

attorney of record via certified mail on this the 3rd day of October, 2018.

> Gary Willford, Interim General Counsel
> ADOC Legal Division
> 301 S. Ripley Street
> Montgomery, Alabama  36104

*Jerusha T. Adams*
Assistant United States Attorney

20